UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CUSTOM GLASS SOLUTIONS, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>ANTHONY RICCI AND ISOCLIMA SPECIALTY GLASS, LLC,<br><br>*Defendants*. | Case No. 2:25-cv-6598<br><br>**VERIFIED COMPLAINT FOR MONETARY DAMAGES AND INJUNCTIVE RELIEF**<br><br>**JURY DEMAND ENDORSED HEREON** |

Plaintiff Custom Glass Solutions, LLC ("CGS"), by and through its undersigned counsel, for its Verified Complaint against Anthony Ricci ("Ricci") and Isoclima Specialty Glass, LLC ("Isoclima"), alleges and avers as follows:

**PARTIES**

1. CGS is a limited liability company formed under the laws of Michigan and is headquartered in Upper Sandusky, Ohio.

2. Ricci was a CGS employee before he resigned and moved to Isoclima. Upon information and belief, Ricci is a Pennsylvania resident located in Fountainville, Pennsylvania.

3. Upon information and belief, Isoclima is a limited liability company organized under the laws of Delaware and is wholly owned by the Isoclima Group which is an Italian corporation headquartered in Este, Italy.

**JURISDICTION AND VENUE**

4. This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because CGS brings claims under the Defend Trade Secrets Act, 18 U.S.C. § 1832, *et seq.* and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* The actions of Defendants alleged herein directly relate to and have a nexus with interstate commerce,

and the state law claims arise under the same common nucleus of operative facts as the federal question claims.

5.  This Court also possess jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) (diversity jurisdiction) because this action is between citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interests and costs. For diversity purposes, Defendants are citizens of Pennsylvania and Italy, and there are no members of CGS which are citizens of either Pennsylvania or Italy.

6.  Venue is appropriate in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to CGS's claim occurred in this district.

7.  The Court has personal jurisdiction over Ricci because he is a citizen and resident of Pennsylvania.

8.  The Court has personal jurisdiction over Isoclima because it is a corporation registered to do business in, and regularly transacts business in, Pennsylvania, and because Isoclima caused harm or tortious injury to CGS by an act in the Commonwealth.

**FACTS AND BACKGROUND**

9.  CGS is North America's leading producer of large-format, laminated glass systems and windshields for vehicle applications. In addition to laminated glass, CGS also manufactures flat, bent, and tempered glass systems, offering a broad range of capabilities and the most diverse selection of glass products for many different transportation and industry segments, including construction, public transportation, law enforcement vehicles, lifestyle vehicles, and commercial transport.

2

10. CGS and Isoclima are direct competitors in the glass processing and glass security industries, and specifically the ballistic glass industry.

### CGS's Confidential Information

11. CGS considers much of the information related to its business as confidential and instructs its employees to keep all business information private unless designated otherwise.

12. CGS confidential information includes: (a) any identifying information about its customers and partners; (b) contact lists, descriptions of process and procedures, and sales and other proprietary information shared with CGS by clients and partners; (c) financial information, including banking, income, and expenses, projections and forecasts, strategic plans, and non-publicly available loans and sales data; and (d) intellectual property, including details on processes, procedures, formulas, patents, technology infrastructure, or other proprietary data.

13. Much of CGS's confidential information constitutes proprietary and trade secret information, such as its pricing information and intellectual property.

14. CGS takes extensive measures to protect its proprietary and confidential information, including both physical and digital security protocols.

15. These measures include, but are not limited to, utilizing password-protected systems with multifactor authentication for all employees, segregating access to sensitive data based on a role and seniority basis, and encryption of files stored on company servers and cloud-based systems.

16. All CGS network users are required to participate in regular data protection and confidentiality trainings.

17. CGS also uses a key card system to restrict entry to CGS's premises and specific departments.

18. CGS maintains security logs of all badge entries and exists, records video surveillance of entryways, server rooms, and sensitive work areas, and has mandatory visitor sign-in procedures and escort policies.

19. Additionally, all employees are required to sign CGS's Code of Conduct and the Electronic Communications and Acceptable Use Policy.

20. CGS's Code of Conduct instructs all employees on what constitutes CGS confidential and/or proprietary information and steps the employees should take to preserve its confidentiality.

21. Upon separation of employment, CGS immediately terminates the terminated employee's IT credentials, cuts off access to the CGS systems, and retrieves all company devices.

### Ricci's Employment, Termination, and Unlawful Conduct

22. Ricci was previously employed by CGS and led the marketing and sale of certain ballistic glass projects, including a barrier that houses public bus drivers.

23. Like all employees, Ricci signed CGS's Code of Conduct and Electronic Communications and Acceptable Use Policy.

24. Ricci provided his notice of resignation on June 24, 2025 and indicated that he would be pursuing a new opportunity outside of the ballistic glass industry.

25. Ricci was terminated from CGS on June 26, 2025.

26. Approximately one month before Ricci sent his resignation, Ricci's direct supervisor, Jeremy Scott, resigned to work for Isoclima.

27. Upon information and belief, Mr. Scott recruited Ricci to work for Isoclima.

28. Immediately upon tendering his resignation, Ricci began accessing and downloading CGS's confidential information for use at his new job at Isoclima.

29. Upon providing his notice, CGS asked Ricci to email the customers he was servicing for purposes of transitioning their point of contact to Ricci's replacement.

30. Ricci was given specific language by CGS leadership to use when communicating with the customers, which included a notification that Ricci was pursuing an opportunity outside of the ballistic glass industry, as Ricci had represented to CGS when he tendered his resignation.

31. Ricci modified the language he was instructed to use, including to remove the reference to him no longer working in the ballistic glass industry.

32. More troubling, however, is that **Ricci added his personal Yahoo email address to the bcc line of each of these customer emails**, which gave Ricci the ability to retain access to CGS's confidential customer information after his employment ended and he no longer had access to his CGS email account.

33. Ricci also bcc'd his personal Yahoo email address on internal CGS emails that discussed the confidential details of certain customer and distributor relationships and projects.

34. Ricci further engaged in a number of suspicious and alarming activities on his work computer which caused CGS to engage a digital forensics company to perform a forensic examination and analysis of both Ricci's work laptop and an external hard drive he returned to CGS after his employment ended.

35. CGS learned that on June 9, 2025, two weeks prior to giving his notice of resignation, Ricci connected an external hard drive to his work laptop for the first time and almost immediately began transferring confidential CGS information to it. This is the first time Ricci ever used an external hard drive, and CGS employees do not use external hard drives as part of their regular CGS job responsibilities.

36. Upon information and belief, as of June 9, 2025, Ricci was in discussions with Isoclima about going to work there.

37. On June 10, 2025, Ricci accessed additional documents while the hard drive was still plugged in, which strongly suggests that those documents were transferred to the hard drive.

38. On June 12, 2025, Ricci accessed multiple confidential documents regarding CGS's law enforcement business in which Ricci had no involvement whatsoever while at CGS—i.e., there would have been no legitimate business reason for Ricci to even access these files, let alone transfer them to an external hard drive.

39. On June 24, 2025, Ricci gave notice to CGS that he was resigning.

40. Late at night **the day after he gave notice**, he downloaded and installed Dropbox on his work laptop, at 2:30 a.m. on June 26, 2025.

41. After he downloaded Dropbox, Ricci purged all browser history data on his CGS laptop in an effort to cover his tracks.

42. CGS then later learned that, the day after his notice of resignation, on June 25, 2025, Ricci accessed and copied a significant number of documents from CGS's OneDrive to his external hard drive.

43. Ricci also accessed files related to SEPTA, which is one of the CGS's customers he emailed with his personal email in the bcc line, so that he would have SEPTA's customer information after his employment ended.

44. Ricci did not stop at just one external hard drive; rather, he transferred CGS confidential information to several other external devices and/or thumb drives. The location of these other external devices remains unknown.

45. Ricci ultimately revealed the existence of the hard drive and sent it back to CGS almost two months after he was gone, in an apparent effort to show that he had "returned" all of CGS's confidential information.

46. On June 26, 2025, CGS discovered that he had bcc'd his personal email address on confidential CGS customer information, and CGS thereafter terminated him for cause. The forensic analysis further revealed that on the day Ricci was terminated, he purged dozens of files from the external hard drive.

47. While CGS does not know every document Ricci misappropriated, CGS reasonably believes that he misappropriated and still has in his possession customer and client information, including purchase orders, spreadsheets showing active fleet numbers, quotes, mold information, weekly reports, planning documents, and sales reports.

### Ricci and Isoclima Have Successfully Used CGS's Confidential Information to Unfairly Compete

48. CGS reasonably believes that CGS's confidential information is still in Ricci's possession on a personal and/or Isoclima device, computer, or server, and that Ricci and Scott are targeting specific CGS law enforcement business on behalf of Isoclima by utilizing CGS's confidential information.

49. CGS reasonably believes that Ricci and Scott are using CGS confidential information that Ricci misappropriated in his final days of employment to unfairly compete against CGS.

50. This concern is heightened by the fact that: Ricci had no experience selling into this specific end market while at CGS; Ricci accessed and downloaded CGS confidential information related to its law enforcement business at and around the time of his termination from CGS, and

certainly after he knew he was going to work at Isoclima; and because Ricci lied to CGS about exiting the ballistic glass industry.

51. CGS recently learned that Ricci and Scott, on behalf of Isoclima, are targeting business with the Texas Department of Public Safety (and presumably other CGS customers), in an end market Isoclima previously had no inroad.

52. Several of the documents improperly downloaded by Ricci onto the hard drive and which are still in his possession include specific purchase orders placed with CGS by its supplier/partner for the upfitting of the Texas Department of Public Safety fleet—the very business that Isoclima is now targeting and successfully winning away from CGS.

53. Ricci would have had no basis or need for accessing these documents for his work at CGS.

54. His possession of these documents allows him to strategically price the Texas business to undercut CGS.

55. CGS has learned that Isoclima is providing ballistic glass to a supplier for end use at the Texas Department of Public Safety, which means that Isoclima has successfully used CGS's confidential information to obtain some of the Texas business.

56. Given that Ricci and Isoclima have already been successful in using CGS's confidential information to unfairly compete, CGS has credible concerns that Ricci and Isoclima will continue to solicit additional CGS customers using CGS's confidential information.

57. Over the past several months, CGS has been in regular communication with Isoclima about Ricci's misconduct and CGS's concerns.

58. Despite these communications, Isoclima has failed to provide adequate assurances to CGS that Ricci, Scott, and potentially others at Isoclima, are not using CGS's confidential information to unfairly compete with CGS and improperly solicit CGS's customers.

59. Defendants' actions have caused significant injury to CGS. CGS has lost and will continue to lose business from its customers that have been solicited by Defendants. Defendants also continue to disclose CGS's confidential information by using it to solicit CGS's business. CGS's business relationships and customer goodwill face increasing threat, which CGS now seeks Court intervention to halt.

60. CGS is entitled to recover all monetary damages it has suffered due to Defendants' conduct, as well as temporary, preliminary, and permanent injunctive relief against Defendants to enjoin them from further tortious interference and to stop the improper disclosure of CGS's confidential information.

## COUNT ONE – TORTIOUS INTERFERENCE WITH CONTRACT
### (Both Defendants)

61. CGS incorporates the foregoing allegations as though fully set forth herein.

62. CGS has existing contracts with its customers who purchase a variety of glass solutions.

63. Defendants have knowledge of those contracts because, among other things, Ricci worked at CGS and was aware of these contracts, and he misappropriated specific confidential CGS information related to those contracts around the time of his resignation.

64. Defendants have induced CGS's customers to breach their contracts with CGS by using CGS confidential information to unfairly compete and undercut CGS's prices.

65. Defendants' conduct is not subject to any privilege or justification and was specifically intended to interfere with and cause CGS's customers to breach their contracts with CGS.

66. As a result of Defendants' intentional interference, CGS has suffered damages in an amount to be proven at trial, but greater than $75,000. CGS is also entitled to a temporary restraining order, and preliminary and permanent injunction which enjoins Ricci and Isoclima from using CGS's confidential information to tortiously interfere with CGS's contracts.

### COUNT TWO – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS
### (Both Defendants)

67. CGS incorporates the foregoing allegations as though fully set forth herein.

68. CGS has business relationships with its customers and has an expectation of continuing those business relationships.

69. Defendants have knowledge of those business relationships because Ricci worked at CGS and was aware of these relationships and he misappropriated specific confidential CGS information related to those relationships around the time of his resignation.

70. Defendants have intentionally thwarted those prospective business relationships by using CGS confidential information to unfairly compete and undercut CGS's prices to solicit CGS's customers away from CGS and to Isoclima.

71. Defendants' conduct is not subject to any privilege or justification and was specifically intended to interfere with CGS's business relationships.

72. But for Defendants' tortious interference, CGS had a reasonable expectation that its relationship with its customers would have continued.

73. As a result of Defendants' intentional interference, CGS has suffered damages in an amount to be proven at trial, but greater than $75,000. CGS is also entitled to a temporary restraining order, and preliminary and permanent injunction which enjoins Ricci and Isoclima from using CGS's confidential information to tortiously interfere with CGS's prospective business relationships.

### COUNT THREE – MISAPPROPRIATION OF TRADE SECRETS UNDER THE PENNSYLVANIA UNIFORM TRADE SECRETS ACT (12 P.S. § 5302 *et seq.*)
### (Both Defendants)

74. CGS incorporates the foregoing allegations as though fully set forth herein.

75. CGS possesses trade secret information from which it derives independent economic value because such trade secret information is not generally known so that other persons cannot obtain economic value from its disclosure or use.

76. CGS takes reasonable steps to maintain confidentiality with respect to its trade secret information, including designating all CGS business information as private unless otherwise designated, advising all employees through its Code of Conduct that all CGS business information should be kept confidential and providing employees steps to maintain its confidentiality, and segregating access to sensitive data based on a role and seniority basis.

77. Ricci misappropriated and/or used CGS's trade secret information without CGS's authorization with the intent to use such trade secret information on behalf of Isoclima in order to unlawfully compete with CGS.

78. Ricci's actions in misappropriating CGS's trade secret information were done willfully and maliciously.

79. Isoclima is aware of Ricci's misappropriation of CGS's trade secret information and hired him to use CGS's trade secrets to unfairly compete with CGS.

80. The ongoing nature of Ricci's role with Isoclima makes the risk of his further disclosure and use of CGS's trade secret information on behalf of Isoclima inevitable.

81. The ongoing nature of Ricci's activities with Isoclima will make disclosure of CGS's trade secret information inevitable, and the continued business activities of Ricci on behalf of Isoclima will cause irreparable harm to CGS.

82. Defendants' actions constitute misappropriation of trade secrets, and CGS is entitled to injunctive relief and damages under the Pennsylvania Uniform Trade Secrets Act, 12 P.S. § 5302 *et seq.*

### COUNT FOUR – MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836, *et. seq.*) (Both Defendants)

83. CGS incorporates the foregoing allegations as though fully set forth herein.

84. CGS possesses trade secret information from which it derives independent economic value because such trade secret information is not generally known so that other persons cannot obtain economic value from its disclosure or use.

85. CGS takes reasonable steps to maintain confidentiality with respect to its trade secret information, including designating all CGS business information as private unless otherwise designated, advising all employees through its Code of Conduct that all CGS business information should be kept confidential and providing employees steps to maintain its confidentiality, and segregating access to sensitive data based on a role and seniority basis.

86. Both CGS and Isoclima sell products in the stream of interstate commerce, and Defendants' actions described herein have a direct and negative impact on CGS's ability to sell its goods and services in the stream of interstate commerce.

87. Ricci misappropriated and/or used CGS's trade secret information without CGS's authorization with the intent to use such trade secret information on behalf of Isoclima in order to unlawfully compete with CGS.

88. Ricci's actions in misappropriating CGS's trade secret information were done willfully and maliciously.

89. Isoclima is aware of Ricci's misappropriation of CGS's trade secret information and hired him to use CGS's trade secrets to unfairly compete with CGS.

90. The ongoing nature of Ricci's role with Isoclima makes the risk of his further disclosure and use of CGS's trade secret information on behalf of Isoclima inevitable.

91. The ongoing nature of Ricci's activities with Isoclima will make disclosure of CGS's trade secret information inevitable, and the continued business activities of Ricci on behalf of Isoclima will cause irreparable harm to CGS.

92. Defendants' actions constitute misappropriation of trade secrets, and CGS is entitled to injunctive relief and damages under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.

## **COUNT FIVE – VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030)**
**(Ricci Only)**

93. CGS incorporates the foregoing allegations as though fully set forth herein.

94. In the course of his employment, Ricci was provided access to CGS's computer and computer systems, which contained CGS's confidential information and trade secrets.

95. Ricci's authorization to use CGS's computers, computer systems, and access CGS files ceased when his employment with CGS ended on June 26, 2025.

96. CGS's computers and computer systems were connected to the internet and used in affecting interstate commerce or communication and thus constitute a "protected computer" within the meaning of the Computer Fraud and Abuse Act.

97. Ricci knowingly engaged in intentional and unauthorized use of CGS's protected computers for the sole purpose of accessing CGS's confidential and trade secret information after he tendered his resignation and through such use obtained electronically stored information belonging to CGS in violation of the Computer Fraud and Abuse Act.

98. Additionally, Ricci knowingly accessed CGS's protected computers to misappropriate confidential information while he was still employed by CGS, as such access exceeded his authorized access.

99. Ricci's intentional and unauthorized use of the protected computers and his password-protected email account resulted in a loss to CGS including, but not limited to, costs in excess of $5,000 incurred to investigate how Ricci obtained unauthorized access to the protected computers and the extent of the unauthorized access, and such costs continue to accrue as the investigation continues. CGS is also entitled to an order restraining or enjoining Ricci from further copying or sharing the valuable information accessed and obtained in violation of the Computer Fraud and Abuse Act.

### COUNT SIX – BREACH OF DUTY OF LOYALTY AND GOOD FAITH BY FAITHLESS SERVANT
### (Ricci Only)

100. CGS incorporates the foregoing allegations as though fully set forth herein.

101. As an employee of CGS, Ricci owed to CGS a common law duty under Pennsylvania law to act in good faith and loyalty and not to act to the detriment of CGS.

102. Ricci breached the duties that existed by knowingly and intentionally misappropriating CGS's confidential information for use at his new job for a competitor, while still employed (and being paid) by CGS.

103. Ricci's actions occurred at the same time as his supposed performance of his duties as an employee of CGS and were directly adverse to the business interests of his employer. Thus, Ricci acted as a faithless servant to CGS.

104. Ricci's actions directly and proximately caused injury to CGS and simultaneously resulted in benefit to Ricci and Isoclima. CGS suffered loss of business and customer goodwill while Ricci and Isoclima gained and profited from that business.

105. As a result of Ricci's conduct, CGS has suffered damages in an amount to be proven at trial, but greater than $75,000. CGS is also entitled disgorgement of all of Ricci's salary and/or wages paid to him during his period of faithless servanthood.

WHEREFORE, CGS respectfully requests the following relief:

A. Actual damages to exceed $75,000;

B. A disgorgement of all salary and benefits paid to Ricci during his period of unfaithful servanthood;

C. Attorneys' fees, costs, and other expenses; and

D. A temporary restraining order, and a preliminary and permanent injunction against Ricci and Isoclima to preclude their use of CGS's confidential information to solicit business and interfere with CGS's prospective business relationships and contracts;

E. Such further and additional relief as the Court deems just and proper.

Respectfully submitted,

/s/ Noelle B. Torrice
Noelle B. Torrice (Pa. I.D. No. 317928)
**BENESCH, FRIEDLANDER,
  COPLAN & ARONOFF LLP**
1313 North Market Street, Suite 1201
Wilmington, Delaware 19801
Telephone: 302.442.7010
Facsimile:  302.442.7012
Email:  ntorrice@beneschlaw.com

Phil Eckenrode (*pro hac vice* forthcoming)
Caroline R. Hamilton (*pro hac vice* forthcoming)
127 Public Square, Suite 4900
Cleveland, Ohio 44114
Telephone: 216.363.4500
Facsimile: 216.363.4588
Email: peckenrode@beneschlaw.com
          chamilton@beneschlaw.com

*Attorneys for Plaintiff*

## JURY DEMAND

Plaintiff hereby demands a jury on all issues so triable.

/s/ Noelle B. Torrice
*One of the attorneys for Plaintiff*

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Seth Wyatt, declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the factual allegations contained in the foregoing Verified Complaint are true and correct.

11/20/25
_____                                              _____
Dated                                                                                              Seth Wyatt